UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

UNITED STATES,

          Plaintiff,

   v.

BRANDON ALTON CONLEY,

          Defendant.

No.  12-CR-00077 JAM

**ORDER DENYING DEFENDANT'S MOTIONS TO SUPPRESS**

    This matter comes before the Court on two Motions to Suppress (Doc. #56, 57) filed by Defendant Brandon Alton Conley ("Defendant") pursuant to Federal Rule of Criminal Procedure 12(b)(3)(c).  The Government opposes both motions.  (Doc. #67, 69).  For the reasons set forth below, Defendant's Motions to Suppress are denied in their entirety.

            I.   FACTUAL AND PROCEDURAL BACKGROUND

    This case arises out of an alleged conspiracy to cultivate marijuana in a warehouse located at 705-709 South California Street in Stockton, California ("the warehouse" or "subject warehouse").  On February 14, 2012, a search warrant was issued

1  for the subject warehouse and other private residences, based on
2  the application and affidavit presented by Special Agent Rebecca
3  Caceres.  Approximately six weeks prior to her application,
4  Caceres and other Narcotics officers received information from a
5  confidential informant that there was a large marijuana grow
6  occurring at the subject warehouse.  In the following weeks and
7  months, the officers conducted an investigation, and found a
8  connection between an individual involved in another, previously
9  investigated marijuana grow in Stockton, and the subject
10  warehouse.  The investigating agents used other methods to
11  confirm the warehouse was being used to grow large quantities of
12  marijuana, including a check of PG&E records.  On February 8,
13  2012, after observing Defendant frequent the warehouse over a
14  period of two days, police officers conducted a traffic stop of
15  the Defendant.  At that time, they observed the smell of "fresh
16  cut marijuana," and several large soil buckets in the back of his
17  car.  Defendant was not taken into custody, nor was his car
18  searched; however, officers did cite Defendant for unlawfully
19  tinted windows.
20      The execution of the search warrant on February 14, 2012,
21  confirmed the warehouse was the site of an illegal marijuana
22  grow.  Over 5,000 marijuana plants were found there.  The next
23  day, several law enforcement agents went to the Defendant's
24  residence, to inform him about the search of the warehouse and
25  ask him about any involvement he may have.  Defendant agreed to
26  discuss the warehouse with the agents, and their conversation
27  occurred in Defendant's front yard.
28      Based on the above, on February 23, 2012, Defendant Conley

1   and his co-Defendant, Ramon Gerardo Armenta, were indicted for

2   violations of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 924(c)(1),

3   the manufacture of marijuana and possession of a firearm in

4   furtherance of drug trafficking crime, respectively.  Doc. #5.

5       On May 22, 2012, Mr. Armenta entered a guilty plea to Count

6   Two of the indictment, and judgment and sentence was accordingly

7   entered on September 9, 2012.  Doc. #32, 35, 54, 55.

8       On October 9, 2012,[1] Defendant filed the pending Motions to

9   Suppress, arguing that the search of the warehouse and his

10  elicited statements were the result of unconstitutional measures

11  used by the investigating officers.  Doc. #56, 57.  Defendant

12  also requested an evidentiary hearing.  Pursuant to a stipulation

13  between the parties, the Court modified the briefing schedule on

14  the motions and moved the hearing on the Motions to December 4,

15  2012.  See Doc. #64.

16      Prior to the hearing, the Court asked counsel for the

17  Defendant and the Government to be prepared to discuss the

18  standing issue raised by the Government as to Defendant's ability

19  to contest the warehouse search and a recent Ninth Circuit case,

20  United States v. Silva, 247 F.3d 1051 (9th Cir. 2001).  In

21  response, Defendant submitted a supplemental brief, providing a

22  more complete discussion of relevant case law.  Doc. #73.

23      On December 4, 2012, after hearing from both parties, the

24  Court found an evidentiary hearing was unnecessary in light of a

25

26  [1] On the same date, Defendant filed a Motion to Unseal the search warrant of the subject warehouse.  At the December 4, 2012,

27  hearing, this Motion was denied as moot, because the Government attached a copy of the search warrant to its Opposition (Doc.

28  #67) to Defendant's Motion to Suppress property (Doc. #56).

3

1  stipulation between the parties.  The Court apprised Defendant of

2  its concern regarding Defendant's ability to meet his burden in

3  demonstrating he had standing to contest the warehouse search,

4  and authorized Defendant to file a supplemental declaration, to

5  make a further attempt to establish standing, within ten days of

6  the hearing.  The Court then ordered the matter submitted on the

7  briefs and the forthcoming declaration.  On December 14, 2012,

8  Defendant filed a supplemental declaration and exhibits.  Doc.

9  #76.

10

11                     III. OPINION

12      A.    Defendant's Motion to Suppress the Warehouse Search

13      Defendant argues the search of the warehouse must be

14  suppressed on two grounds: 1) the executed search warrant was

15  defective because it was not supported by probable cause; and 2)

16  the traffic stop of Defendant was improper and the use of

17  information obtained during the stop by officers in the search

18  warrant renders the search warrant "fruit of the poisonous tree,"

19  and invalid.  The Government responds by first arguing that

20  Defendant lacks standing to challenge the warehouse search, then

21  that the traffic stop was supported by reasonable suspicion.

22  These arguments are discussed below in the order presented by the

23  parties.

24          1.    Standing to Contest Warehouse Search, Generally

25      In its Opposition, the Government argued that the Defendant

26  does not have standing to contest the search of the warehouse

27  because Defendant failed to present evidence establishing he had

28  a reasonable expectation of privacy in the subject warehouse.

4

1   Doc. #67.  Defendant submitted a declaration with his Reply (Doc.

2   #71), which merely stated that Defendant "maintained possession

3   of a key to the [subject warehouse,] and was granted permission

4   to enter the premises at-will . . . ."  Doc. #71, Exhibit A.

5   Defendant argued that these two facts, alone, established that he

6   had standing to challenge the search.  Doc. #71.  Defendant's

7   supplemental declaration, submitted on December 14, 2012, added

8   the following facts: 1) Defendant was granted permission to

9   access and enter the subject warehouse by Chris Rocha; 2) Chris

10  Rocha provided Defendant with a key to the warehouse, and a copy

11  of the lease for the warehouse; 3) Defendant granted co-Defendant

12  Ramon Gerardo []Armenta "permission to stay overnight at the

13  warehouse and provided him a spare key to the entrance door . .

14  .;" 4) Defendant brought a refrigerator and microwave to the

15  warehouse, and allowed co-Defendant Armenta to use them; 5)

16  Defendant "also invited Richard Ramirez to enter the [subject

17  warehouse];" and 6) a shotgun registered to the Defendant was

18  found at the subject warehouse.  Doc. #76.  Defendant also

19  submitted several documents with his declaration, which included

20  a copy of the lease and several police reports, and filed a copy

21  of Chris Rocha's grand jury testimony under seal.  Id.; Doc. #77.

22  The Court has considered all of these documents.

23      Defendant relies primarily on two cases from the Ninth

24  Circuit, and one case from the Eleventh Circuit, to support his

25  challenge to the warehouse search.  However, as explained below,

26  the cases cited by Defendant are readily distinguishable, and the

27  Ninth Circuit case U.S. v. Silva, 247 F.3d 1051 (9th Cir. 2001),

28  forecloses any argument by the Defendant that he had a reasonable

5

expectation of privacy in the warehouse, sufficient to raise a
Fourth Amendment challenge to its search.

The Supreme Court has made clear that in order to "claim the
protection of the Fourth Amendment, a defendant must demonstrate
that he personally has an expectation of privacy in the place
searched, and that his expectation is reasonable." Minnesota v.
Carter, 525 U.S. 83, 88 (1998); see also United States v. Silva,
247 F.3d 1051 (9th Cir. 2001) ("Defendant[] ha[s] the burden of
establishing that, under the totality of the circumstances, the
search [] violated [his] legitimate expectation of privacy.").
This "standing" inquiry is really subsumed within the substantive
Fourth Amendment law, and the Court must look to the totality of
the circumstances in evaluating a Fourth Amendment challenge.
*Id*.

It is well-established "[p]roperty used for commercial
purposes is treated differently for Fourth Amendment purposes
from residential property." Carter, 525 U.S. at 90.  "'An
expectation of privacy in commercial premises [] is different
from, and indeed less than, a similar expectation in an
individual's home.'" Id. (quoting New York v. Burger, 482 U.S.
691, 700 (1987)).

The first case relied on by Defendant is United States v.
Broadhurst, 805 F.2d 849 (9th Cir. 1986).  Defendant argues
Broadhurst establishes that when there is evidence of a
formalized agreement between defendants, indicating control and
supervision of the place searched, it is sufficient to invoke the
protection of the Fourth Amendment.  Doc. #73 at pg. 2-3 (citing
Broadhurst, 805 F.2d 849 (9th Cir. 1986)).  However, in that

1   case, the greenhouse that was the subject of the search was

2   located on a residential property owned by some of the

3   defendants.  805 F.2d at 851.  One of the defendants did not play

4   a role in the purchase of the property, or have an ownership

5   interest in the property, but she was tasked with cleaning and

6   processing the marijuana.  Id. at 852.  She also "made notations

7   in a diary regarding marijuana cultivation."  Id.  This operation

8   had been ongoing for at least 8 months, as this was the time

9   between the DEA's initial observation of the greenhouse in

10  January 1982, and the execution of the search warrant in August.

11  Id. at 850-852.  These facts, coupled with the fact that several

12  of the defendants share the same last names, indicated there was

13  "a formalized arrangement among the defendants, indicating joint

14  control and supervision of the place searched . . . ."  Id.  None

15  of these facts are present in this case – Defendant has not

16  proffered evidence to demonstrate there was a "formalized

17  arrangement" to substantiate a claim of "joint control and

18  supervision of the place search," and therefore, Broadhurst is

19  distinguishable and does not help the Defendant.  Cf. Doc. #71,

20  76.  Indeed, a copy of a lease to the subject warehouse tells

21  this Court nothing about Defendant's role in the marijuana grow

22  or any joint control he may have of the premises.  Cf.

23  Broadhurst, 805 F.2d 849.  Although Defendant maintained a key to

24  the premises, other cases discussed below demonstrate that that

25  fact alone is not enough.  In Broadhurst, there were an

26  identifiable number of individuals involved in the illegal

27  marijuana operation, who were all involved for a finite period of

28  time.  Id.  Again, there is no such evidence before this Court to

1   demonstrate there was a formalized agreement and joint control

2   over the subject warehouse that would give Defendant a reasonable

3   expectation of privacy in the premises.   Finally, Broadhurst is

4   further distinguishable from the case at bar because the

5   greenhouse was part of a residential property owned by some of

6   the defendants, unlike the commercial warehouse here.

7        United States v. Davis, 932 F.2d 752 (9th Cir. 1991), is

8   cited by the Defendant for the proposition that it establishes he

9   had a reasonable expectation of privacy in the subject warehouse.

10  However, Davis involved the search of a safe, located within a

11  residence, and is immediately distinguishable on that ground.

12  932 F.2d at 755-57.  Unlike this case, the defendant in Davis

13  also claimed ownership of the safe, and the heroin that was found

14  inside of it.  Id.  In light of the significant differences from

15  the case at bar, the Davis case is not persuasive and has no

16  bearing on Defendant's ability to establish standing.

17       The case relied on most heavily by Defendant is United

18  States v. Chavez, 169 F.3d 687, 691 (11th Cir. 1999).  In Chavez,

19  the Court found the defendant had standing to contest the search

20  of a warehouse based on two important reasons: 1) the defendant

21  had the only key to the warehouse; and 2) defendant kept

22  "personal and business papers at the warehouse."  169 F.3d at

23  691.  While Defendant did have a key to the subject warehouse,

24  there is no evidence that it was the only key, making this case

25  distinguishable on that basis alone.  Chavez is further

26  distinguishable, however, because that defendant used the

27  warehouse to keep personal effects that he seemingly meant to

28  keep private.  Id.  While Defendant did bring a refrigerator and

8

microwave to the subject warehouse, these are hardly akin to personal and business papers.  The fact that Defendant had property at the warehouse does not bring this case within Chavez, because there is no evidence that Defendant had a subjective, or objective, expectation of privacy in the warehouse and the property he kept there.  As discussed above, there is no evidence regarding the number of people with access to the warehouse, which appears to be the most important factor in Chavez. Accordingly, the Court finds that Chavez does not aid Defendant in establishing standing in this case.

Silva is the most analogous case, and it provides ample ground for denying Defendant's Motion to Suppress for lack of standing.  In Silva, officers were attempting to execute a warrant in a rural area on a residence where the manufacture of methamphetamine was suspected, and were having difficulty locating the property that was the subject of the warrant.  247 F.3d 1051, 1053.  As they were driving away, they noticed "a cloud of gas emanating from a shed 32 feet from the residence . . ." a few doors down from the residence that was the subject of the warrant.  Id.  Because the shed door was ajar, the officers observed what appeared to be the manufacture of methamphetamine. Id.  They detained three individuals, the defendants, that were there, and obtained a warrant to search the shed.  Id.  Although the defendants argued the search of the shed violated the Fourth Amendment, the Ninth Circuit held that the defendants did not have standing to challenge the search.  Id. at 1054, 1056.

The defendants "claimed they had a legitimate expectation of privacy in the shed as a 'commercial' area and that they expected

1  to be left alone as they manufactured methamphetamine." Id. at

2  1054-1055.  One of the defendants had a key to the shed's lock,

3  and all the defendants submitted declarations saying they had

4  stayed in the shed overnight, the night before the police

5  arrived.  Id. at 1055.

6     The Ninth Circuit discussed several cases that involved

7  similar circumstances, before holding that the "[d]efendants had

8  no legitimate expectation of privacy in the shed, either as

9  overnight guests or as renters of commercial property." Id. at

10 1056.  Importantly, the court emphasized: "The only hard evidence

11 that [d]efendants cite is the key that was found on [one of the

12 defendant's] person.  But the presence of the key tends to show

13 only that he was permitted to enter the shed; it proves nothing

14 about the duration of that permission or his expectation of

15 privacy therein." Id.  The court went on to state that there was

16 no evidence that the defendants paid rent on the shed, were there

17 for a significant period of time, or were "there for any activity

18 other than the purely commercial activity of manufacturing

19 drugs." Id.

20     In cases where courts found there was a legitimate

21 expectation of privacy in a commercial property, there was

22 concrete evidence of control of the property in the form of

23 having the only key, or paying rent, or claiming ownership in the

24 seized property.  See id. at 1055-56.  None of these additional

25 facts are present here.  Indeed, there is no evidence before this

26 Court regarding how many people had access to the warehouse, or

27 any indication that the Defendant had control of, or an ownership

28 interest in, the seized marijuana.  Silva forecloses Defendant's

                                    10

1  claim that he had a legitimate expectation of privacy in the

2  warehouse that would allow him to properly assert a Fourth

3  Amendment challenge to the search.

4       Defendant's attempt to distinguish _Silva_ is unpersuasive.

5  Defendant argues that _Silva_ is distinct from this case on two

6  grounds.  Doc. #73 at 3-4.  First, Defendant avers that unlike

7  the _Silva_ defendants, he was "observed on numerous occasions" at

8  the subject warehouse.  Id.  Next, Defendant argues the lack of

9  an identifiable host was significant to the _Silva_ court in

10 finding those defendants lacked standing.  Id.  Defendant's

11 arguments fail for several reasons.  First, there was less than a

12 week between the first time the officers observed Defendant, on

13 February 7, and the time he was arrested, and Defendant has

14 presented no argument or evidence relating to the amount of time

15 he spent at the warehouse.  In addition, Defendant's argument

16 regarding the lack of an identifiable owner was only mentioned in

17 passing by the Ninth Circuit, as it was part of the district

18 court's factual findings, which are only disturbed if made in

19 clear error.  Indeed, the _Silva_ court focused on the fact that

20 the only evidence was the key that one of the defendants had.

21 This is the exact argument Defendant made in this case, in an

22 attempt to establish he had standing, and it too must fail.

23      For all of these reasons, the Court finds Defendant has

24 failed to meet his burden in producing evidence to establish

25 standing to contest the warehouse search.  Accordingly,

26 Defendant's Motion to Suppress evidence collected from the

27 February 14, 2012, search of the subject warehouse is denied.

28 ///

1 ///

2            2.   Validity of Warehouse Search Warrant

3     Both parties focus on the validity of the search warrant in

4 their briefs.  See Doc. #56, 67.  Assuming, *arguendo*, that

5 Defendant had standing to challenge the lawfulness of the search

6 of the warehouse, see United States v. McPhearson, 977 F.2d 593

7 (9th Cir. 1992), the Court finds there was a substantial basis

8 for concluding that the search warrant at issue in this case was

9 supported by probable cause.  Indeed, Magistrate Judge Newman's

10 "finding of probable cause is entitled to great deference . . .

11 ."  United States v. Crews, 502 F.3d 1130, 1135 (9th Cir. 2007),

12 As outlined in the Government's brief and described above, the

13 information provided by the confidential informant, which was

14 bolstered by further investigation, including the PG&E records

15 check, provided a substantial basis for Magistrate Judge Newman's

16 conclusion that probable cause existed.  Cf., e.g., United States

17 v. Rios, 434 Fed.Appx. 648 (9th Cir. 2011).  Accordingly, the

18 Court finds that even though the Defendant lacks standing to

19 challenge the warehouse search, the search warrant at issue was

20 otherwise valid.  See McPhearson, 977 F.2d 593.

21            3.   Traffic Stop

22     On February 8, 2012, Defendant was stopped by police around

23 6 p.m. and cited for having tinted windows in violation of

24 California Vehicle Code § 26708.  Narcotics officers had observed

25 Defendant, and his vehicle, at the subject warehouse the day

26 before and the day of the stop, and instructed other police

27 officers to conduct the traffic stop of Defendant on February 8

28 as a part of their ongoing investigation of the marijuana grow at

1 the warehouse.

2     In its Opposition brief, the Government presents two
3 independent justifications for the traffic stop; first, that
4 Defendant's windows were tinted in an unlawful manner, and
5 second, under the "collective knowledge doctrine," the
6 investigating officer's reasonable suspicion supported the stop.
7 Doc. #67.  At the December 4 hearing, Defendant argued that there
8 was a disputed issue regarding the tinted windows that required
9 an evidentiary hearing.  Specifically, Defendant's attorney
10 represented to the Court that the Defendant could present
11 evidence, through his own testimony, that his car windows were
12 rolled down at the time the traffic stop was conducted, and
13 therefore, the officers could not have stopped him for one of the
14 reasons presented by the Government.  Though the Government
15 disputed this assertion, it agreed to forego the tinted window
16 justification for the traffic stop, and rely solely on the
17 collective knowledge doctrine to justify the traffic stop,
18 eliminating the need for an evidentiary hearing on this issue.
19 In light of this stipulation by the Government, the Court agreed
20 to evaluate the legitimacy of the traffic stop by looking only to
21 the evidence regarding Defendant's alleged involvement in ongoing
22 criminal activity through the collective knowledge doctrine.
23 Accordingly, the Court will not discuss the tinted window issue
24 presented in the parties' briefs.

25     "Under the Fourth Amendment, government officials may
26 conduct an investigatory stop of a vehicle only if they possess
27 'reasonable suspicion: a particularized and objective basis for
28 suspecting the particular person stopped of criminal activity.'"

1   United States v. Twilley, 222 F.3d 1092 (9th Cir. 2000).  In the

2   Ninth Circuit, the collective knowledge doctrine allows a court

3   to determine whether an investigative stop "complie[s] with the

4   Fourth Amendment by 'looking to the collective knowledge of all

5   the officers involved in the criminal investigation although all

6   of the information known to the law enforcement officers involved

7   . . . is not communicated to the officer who actually . . ."

8   affects the stop.  United States v. Ramirez, 473 F.3d 1026, 1032

9   (9th Cir. 2007) (quoting United States v. Sutton, 794 F.2d 1415,

10  1426 (9th Cir. 1986)).

11      Defendant argues that United States v. Thomas, 211 F.3d 1186

12  (9th Cir. 2000), provides a basis for granting Defendant's Motion

13  regarding the traffic stop because in that case, the traffic stop

14  was based on a "mere hunch," and not reasonable suspicion.  In

15  Thomas, the Government argued three factors created reasonable

16  suspicion: 1) information that "narcotics might possibly be

17  located" at a house under surveillance; 2) the stopping officer's

18  observation of several people coming and going from said house;

19  and 3) "three or four thumps from the interior of the garage,

20  which [the officer] stated . . . were the sounds of packages of

21  marijuana."  211 F.3d at 1189.  In this case, the Government

22  presents much more evidence of reasonable suspicion to justify

23  the traffic stop.  Cf. id.  First, a confidential informant

24  observed a marijuana grow in the subject warehouse, and he

25  reported this to the investigating Narcotics officers.  The

26  officers confirmed the location of the warehouse, and found the

27  vehicle of another suspect, involved in another recent marijuana

28  grow that the officers had investigated, at the subject

14

warehouse.  This provided further support for the officer's suspicion that there was an illegal marijuana grow occurring in the warehouse.  In addition, law enforcement officers observed Defendant coming and going from the warehouse for two days. These facts, taken together, provide much more support for the traffic stop than the officers in <u>Thomas</u> had.  <u>See</u> <u>Thomas</u>, 211 F.3d at 1189-92.  Finally, the officers that stopped Defendant were directed to do so by Narcotics detectives, and under the collective knowledge doctrine, all of the circumstances surrounding the warehouse are considered by the Court.  In light of the above, the Court finds the traffic stop of Defendant was supported by reasonable, articulable suspicion that the Defendant was engaged in criminal activity, and therefore, Defendant's Motion to Suppress the warehouse search because of the traffic stop, or any evidence obtained during the traffic stop, is denied.

B.   <u>Defendant's Motion to Suppress Statements He Made to the Police</u>

Defendant moves to suppress statements he made to law enforcement on February 15, 2012, outside of his residence in Stockton, California.  Doc. #57.  Defendant argues he was subject to custodial interrogation without first being given a Miranda warning and that law enforcement disregarded his invocation of his right to counsel.  <u>Id.</u>  For these reasons, he argues, his statements were obtained in violation of the Fifth Amendment, and therefore, must be deemed inadmissible.  <u>Id.</u>  The Government challenges Defendant's characterization of the February 15 encounter, arguing it is clear that at no point was the Defendant

15

subject to a custodial interrogation.  Doc. #69.  In addition, even if Defendant unequivocally invoked his right to counsel, it is the Government's position that he waived it by subsequently reinitiating a conversation with law enforcement, and therefore, Defendant's Motion to Suppress must be denied.  Id.

The day after the search warrant was executed on the subject warehouse, several law enforcement agents went to the Defendant's residence.  Special Agent Caceres, United States Deputy Marshal Todd Guendert, and Metro agents Mike Corral and Jimmy Fritts found Defendant outside of his house, in the front yard, and Caceres informed Defendant about the search of the warehouse. The Defendant agreed to speak to the agents, and told them that he was aware of the marijuana grow at the warehouse but that he had been informed by an attorney that it was legal.  Defendant then informed the agents that he had the attorney's business card in his truck and asked the agents if he could retrieve it to show it to them.

In the Motion to Suppress, Defendant argues this initial request to get his attorney's card was an invocation of his right to counsel, which should have caused the law enforcement agents to promptly stop the encounter.  The Supreme Court has made clear that a right to counsel only attaches during a "custodial interrogation," as part of the prophylactic "procedural safeguards" which insure a defendant's Fifth Amendment rights are protected.  See Davis v. U.S., 512 U.S. 452, 456-57 (1994) (citing Miranda v. Arizona, 384 U.S. 436, 469-473 (1966)).  Since Defendant does not argue in his Motion to Suppress that he was "in custody" at this point, he apparently concedes that his right

16

1    to counsel could not have been properly invoked.  Even assuming,

2    *arguendo*, that Defendant was in custody at this point, it is

3    well-established that the invocation of one's right to counsel

4    must be clear and unambiguous.  See Davis, 512 U.S. at 459.  As

5    the Government correctly argues, Defendant's request to retrieve

6    and present law enforcement with an attorney's card is far from a

7    clear request to speak to an attorney.  See id. (law enforcement

8    are not required to stop questioning a suspect who "might want a

9    lawyer").  Accordingly, the Court finds that Defendant's request

10   to find his attorney's card was not an invocation of his right to

11   counsel, and the law enforcement agents were under no obligation

12   to terminate the conversation with Defendant at that time.  See

13   id. at 459-462.

14       Defendant then attempted to get the attorney's card from his

15   truck, but the truck was locked.  He informed the agents that he

16   needed to get the keys from inside the house, which prompted

17   Fritts to ask Defendant if he had any registered weapons inside

18   the house.  Defendant informed the agents that he had a pistol

19   located near the front door, and he allowed agents to enter his

20   house and empty the gun of ammunition.  Guendert retained the

21   ammunition and the magazine from Defendant's Glock, which

22   Defendant argues constituted a *de facto* arrest.  From this point

23   forward, it is Defendant's position that he was in custody.  See

24   Doc. #57.  Defendant and the agents then returned to the front

25   yard, Guednert placed Defendant's gun in the bed of his truck,

26   and they all continued to talk about Defendant's involvement with

27   the marijuana grow at the subject warehouse.  After Caceres asked

28   Defendant if he knew anything about a marijuana grow on Vicki

Lane, he stated that he "wanted to have a chance to speak with
the attorney . . ." whose card he had been looking for.  The
agents stopped asking about Defendant's knowledge and involvement
with the subject warehouse, and other marijuana grows, and Fritts
asked Defendant if his roommate, Richard Ramirez, was home.
Defendant denied Ramirez was home, and when asked for his phone
number, Defendant provided agents with the wrong number.  The
agents asked Defendant to wait in the front yard, while they
knocked on the door to Defendant's house.  Ramirez was at home,
and the agents proceeded to talk to him.  After speaking with
Ramirez, Caceres re-approached the Defendant to let him know they
were done.  Defendant then initiated a conversation with Caceres,
stating that he had time to think about the Vickie Lane warehouse
and continuing to discuss the subject warehouse.

Defendant first argues that the agents should have
administered a Miranda warning when they retained the ammunition
and magazine from Defendant's Glock, because this act constituted
a *de facto* arrest triggering the Fifth Amendment protections.
The Ninth Circuit aptly summarized the appropriate inquiry
regarding whether a suspect is in custody, triggering the
applicability of Miranda, in United States v. Kim:

> An officer's obligation to give a suspect Miranda
> warnings [] extends only to those instances where the
> individual is in custody.  To determine whether an
> individual is in custody, a court must, after
> examining all of the circumstances surrounding the
> interrogation, decide whether there was a formal
> arrest or restraint on freedom of movement of the
> degree associated with a formal arrest.  The inquiry
> focuses on the objective circumstances of the
> interrogation . . . [, t]hat is, [a court] must
> determine whether the officers established a setting
> from which a reasonable person would believe he or she
> was not free to leave.  [Relevant factors] to deciding

1   that question [include]: (1) the language used to
2   summon the individual; (2) the extent to which the
    defendant is confronted with evidence of guilt; (3)
    the physical surroundings of the interrogation; (4)
3   the duration of the detention; and (5) the degree of
    pressure applied to detain the individual.
4

5   292 F.3d 969, 973-74 (9th Cir. 2002) (internal quotations and

6   citations omitted).

7       The circumstances surrounding the questioning of the

8   Defendant in his front yard indicate that at no point was the

9   Defendant in custody.  The interaction between the agents and

10  Defendant was causal – it was in the Defendant's front yard, the

11  agents asked general questions about Defendant's knowledge of the

12  subject warehouse, and when Defendant indicated he wanted to

13  speak with an attorney, the officers immediately ended their

14  questions related to Defendant's involvement.  The fact that

15  Guendert retained Defendant's ammunition and magazine does not

16  transform the exchange into "a formal arrest or restraint on

17  freedom of movement of the degree associated with a formal

18  arrest."  At no point did Defendant ask for the ammunition or

19  magazine back.  Defendant freely agreed to speak to the law

20  enforcement agents, and the fact that he conversed with them

21  before and after the retention of the contents of his Glock

22  indicates that the Defendant did not believe he was not free to

23  terminate the encounter.  Under all of these circumstances, the

24  Court finds that because "a reasonable person would [not] believe

25  he or she was not free to leave," Defendant was not in custody

26  and not entitled to a Miranda warning.

27      Moreover, an examination of each of the relevant factors

28  further supports a finding that Defendant was not in custody.

First, when the agents approached Defendant in his front yard, the Defendant was immediately informed he was not under arrest and the agents discussed the purpose of their visit.  However, the agents did not accuse the Defendant of anything, nor did they "confront him with evidence of guilt."  Since the interaction occurred in Defendant's front yard, out in the open, the physical surroundings indicate the setting was not coercive.  Finally, the length of the interaction was short, and there was little, if any, pressure applied to Defendant to participate in the questioning.  For these reasons, and the reasons discussed above, the Court finds that the Defendant was not in custody at any point during his interaction with the agents, and the agents had no obligation to mirandize the Defendant.  Cf. United States v. Kim, 292 F.3d 969 (9th Cir. 2006).

Defendant also argues that the agent's continued questioning, after Defendant reinitiated the conversation with them, was improper and in violation of the Fifth Amendment.  Even though the Court found that the Defendant was not in custody, and therefore, his right to counsel did not apply, the Court will address Defendant's arguments regarding the continued conversation.  It is well-established that a suspect can waive his right to counsel by initiating further conversation with law enforcement.  See Oregon v. Bradshaw, 462 U.S. 1039 (1983). Here, Defendant "unilaterally [reinitiated] the conversation . . ." with the agents in this case, and thus, it is clear that he waived any right to counsel he may have had, and the agents "were not prohibited from further questioning."  Anderson v. Terhune, 467 F.3d 1208, 1213 (9th Cir. 2006) (citing Bradshaw, 462 U.S. at

1   1045-46)).  It is clear that there was no Fifth Amendment

2   violation when the agents continued to speak to Defendant after

3   Defendant reinitiated their conversation outside the Defendant's

4   home, and therefore, Defendant's Motion to Suppress on this

5   ground must be denied.  See Bradshaw, 462 U.S. 1039.

6

7                             IV.  ORDER

8        After carefully considering the papers submitted in this

9   matter, and the oral arguments of counsel for both parties on the

10  issues raised in those briefs, it is hereby ordered that

11  Defendant's Motions to Suppress (Doc. #56, 57) are DENIED.

12

13       IT IS SO ORDERED.

14  Dated: December 19, 2012

15                              _____
                                JOHN A. MENDEZ,
                                UNITED STATES DISTRICT JUDGE

16

17

18

19

20

21

22

23

24

25

26

27

28